[Civ. No. 20400.   Second Dist.. Div. Three.   Apr. 28, 1955.]

BEN MINDENBERG, Plaintiff and Appellant, v. CARMEL FILM PRODUCTIONS, INC. (a Corporation), Defendant and Appellant.

Vaughan & Brandlin and Warren J. Lane for Plaintiff and Appellant.

Ernest J. Utley and Raymond Wallenstein for Defendant and Appellant.

ASHBURN, J. pro tem.*—This case went to trial upon the seventh amended complaint and answer thereto. The complaint was in three counts. A nonsuit was granted all

*Assigned by Chairman of Judicial Council.

defendants[1] upon the first and third causes of action and to all of them, except Carmel Film Productions, Inc., upon the second count. Judgment was ultimately rendered against that defendant for $19,750 with interest and costs. Plaintiff appeals from the judgment of nonsuit and defendant Carmel Film Productions, Inc., appeals from the judgment against it.

Plaintiff charged defendants with fraud and conspiracy; although the burden of proof rested on him he did not take the witness stand and his failure to do so was not explained. His counsel rested upon examination of four of the defendants under section 2055, Code of Civil Procedure, and upon the testimony of an accountant. The cases were submitted in this court upon a single record and one set of briefs. Plaintiff's counsel filed the first brief, which is devoted to the matter of the nonsuits; defendants filed a brief discussing those matters as well as Carmel's attack upon the judgment against it; plaintiff has presented no reply brief, thus virtually confessing the error alleged to inhere in that judgment.

The first count of this seventh amended complaint turns upon the allegation of a joint venture between plaintiff and defendants Harris and Belinkoff, one which contemplated and pursued the use of a corporate form—defendant Carmel— as a mere matter of convenience in conducting the affairs of the joint venture. Plaintiff relies upon the doctrine of *Elsbach* v. *Mulligan,* 58 Cal.App.2d 354, 368 [136 P.2d 651]: "If a corporation or a formal partnership is a mere agency for the purpose of convenience in carrying out a joint venture agreement, and independent and innocent third parties, such as creditors or stockholders, are not injured thereby . . . justice would seem to demand that in determining the rights of the parties they be placed in the position each occupied under the original agreement." The same principle of equity is discussed and applied in *Hillman* v. *Hillman Land Co.,* 81 Cal.App.2d 174, 183-185 [183 P.2d 730]; *Hiehle* v. *Torrance Millworks, Inc.,* 126 Cal.App.2d 624, 628 [272 P.2d 780], and other cases. Plaintiff-appellant, assuming the necessary predicate, argues that he was excluded from participation in the affairs of the joint venture and that its assets were appropriated by the individual defendants and their corporate instrumentalities, Carmel Film Productions, Inc., and Hollywood Film Enterprises, Inc., each of which is al-

---

[1]Defendants are Carmel Film Productions, Inc., Mickey Kaplan, Ted Harris, Tom Emmett, David Belinkoff, Sidney Becker, Ezra E. Stern, Hollywood Film Enterprises, Inc.

leged to be their *alter ego.* Plaintiff claims a right to accounting and other relief. The theory is well conceived, but the evidentiary support is too attenuated to deserve recognition as substantial proof.

The evidence shows without conflict that the original plan was formation of a corporation and the conduct of business by it, each of the three (Mindenberg, Harris and Belinkoff) to own one-third of the stock; that the corporation—Carmel—was promptly formed; that it conducted the business throughout, observing the customary corporate forms, electing officers and directors, conducting directors' meetings, acting through its elected officers, etc.; 10 shares of stock were issued to or for the benefit of each of the three participants—plaintiff, Harris and Belinkoff. The testimony and other proof fails to reveal any respect in which the corporation was used as a blind or sham, or as an agency of the stockholders in any manner or sense other than that of the normal corporation. The only evidence to which plaintiff points in support of his claim of joint venture is the testimony of Belinkoff: "Q. Now, Mr. Belinkoff, sometime in the latter part of 1946 it is true, is it not, that you and Mr. Harris and Mr. Mindenberg had a conversation about going into business together? A. Yes. Q. And during the course of those conversations isn't it true that the three of you agreed to go into business? A. Yes. Q. And is it not true that it was agreed that Mr. Mindenberg's share in the business and his part of the expenses incurred in the corporate business would be one-third? A. Right." It will be noted that the transaction of "corporate business" is assumed in the last question. The same witness testified that the original agreement was ". . . to go in, form a corporation, and loan the business whatever we felt would be necessary . . ."; that the interest of each was to be represented by a third of the corporate stock; that a joint venture or partnership was never mentioned; that there was no discussion ". . . which indicated an operation other than through a duly organized corporation." Defendant Harris testified that in the beginning it was definitely discussed that the business was to be a corporation and each was to have a third of the corporate stock. Defendant Emmett said that, when renting an office from him at the beginning of the enterprise, plaintiff ". . . told me that he and Mr. Harris were planning on forming a corporation to sell and distribute 35 millimeter films." ▮ Plaintiff's entire argument with respect to the first count hinges upon the Belinkoff

statement that the three men "agreed to go into business." Of itself this does not imply a joint venture or any specific type of operation. ▆ Qualified by immediate reference to "corporate business," and later explained as meaning that and nothing else, this evidence could afford no substantial support to plaintiff's claim and none of the above cited cases indicates the contrary, nor do any other authorities with which we are familiar. Not only did plaintiff fail to testify, but his written agreements (the basis of count 2) contain no slight intimation of any joint venture in relation to the corporation or its assets or business. The trial judge properly granted a nonsuit on the first cause of action.

The third count seeks damages for wrongful procurement of breach by Carmel of the contract upon which the second rests, namely, a contract of the corporation to purchase the shares of its stock owned by plaintiff. ▆ It will appear from the discussion of that count that the contract was not an enforceable one because unlawful on grounds of public policy, and hence the causing of its breach by defendant Carmel could not give rise to a cause of action for damages. (Prosser on Torts, p. 980; Rest., Law of Torts, § 766, Comment c at p. 54; 86 C.J.S. § 44, p. 965.)

▆ It is alleged that the defendants acted pursuant to a conspiracy to induce a breach of contract. But that does not change the legal aspect of the matter. On the civil side a charge of conspiracy is important only for the purpose of showing joint action and joint liability for commission of a wrong. ▆ But if no wrong is done, the conspiracy to accomplish the nontortious act does not create a cause of action. (*Scarbourough* v. *Briggs,* 81 Cal.App.2d 161, 167 [183 P.2d 683]; *Bowman* v. *Wohlke,* 166 Cal. 121, 124 [135 P. 37, Ann.Cas. 1915B 1011]; *Orloff* v. *Metropolitan Trust Co.,* 17 Cal.2d 484, 488 [110 P.2d 396]; 11 Cal.Jur.2d § 47, p. 272.) The nonsuit was properly granted as to the third count.

▆ The second cause of action seeks recovery upon a contract between plaintiff and the corporation, Carmel Film Productions, Inc. There are no other parties to it and the nonsuit was therefore properly granted as to all defendants other than Carmel.

With respect to the propriety of the judgment against Carmel a further statement of facts is needed. Shortly after the corporation was formed 30 shares of stock were issued, 10 each to Harris, Becker and Ezra Stern. The shares issued to Becker were so placed at the request of Belinkoff because

he and Becker were interested jointly; the shares in the name of Stern were so issued at plaintiff's request and because of his fear of seizure under a government or other lien. These shares were held by Stern in trust for plaintiff. On March 8, 1948, plaintiff and Carmel made a written agreement which recited *inter alia* the issuance of the 30 shares of stock, of which "10 shares to Ezra E. Stern, attorney for Carmel," and then said: "The parties agree that they will cause to be issued 18¾% of the authorized stock to Mindenberg and his wife, Rose Harris Mindenberg, as joint tenants. The stock to be issued to Mindenberg shall be fully paid and shall be issued to him without cost." And: "Pending the issuance of said stock, it is understood that Mindenberg and his wife shall have a present 18¾% interest in and to all of the assets of said corporation . . .." Whether this 18¾ per cent interest in the assets was to be in addition to the 10 shares held by Stern for plaintiff or was intended as a reduction in plaintiff's interest does not appear. There was no evidence on the subject other than the writing.

No attempt was made to obtain a permit from the Commissioner of Corporations to issue any stock pursuant to this arrangement. This contract ordinarily would be classified as a sale of a security. (See *People* v. *Oliver* 102 Cal.App. 29, 36 [282 P. 813]; *People* v. *Sidwell,* 27 Cal.2d 121, 127 [162 P.2d 913]; *People* v. *Hoshor,* 92 Cal.App.2d 250, 254 [206 P.2d 882].) ■ But the record shows that plaintiff was then active in the corporation and the contract expressly contemplates a continuance of that situation. "If the transaction is one in which the assignee is merely an investor who for a consideration is given the right to share in the profits or proceeds of an enterprise to be conducted by others, the instrument representing such interest is a security. Where, however, as in the present case, the assignee is to share in the conduct of the enterprise, the instrument representing an assignment of a fractional interest in the production of oil is not a security within the act." (*Austin* v. *Hallmark Oil Co.,* 21 Cal.2d 718, 727 [134 P.2d 777].) To the same effect are *People* v. *Syde,* 37 Cal.2d 765, 768 [235 P.2d 601]; *People* v. *Gould,* 37 Cal.2d 885 [235 P.2d 604]. Those cases seem to be applicable here. ■ Moreover, defendant Carmel is in the position of the issuer of a security and cannot take advantage of the absence of a permit. (*Austin* v. *Hallmark Oil Co., supra,* 21 Cal.2d 718, 727; *Eberhard* v. *Pacific Southwest L. & M. Corp.,* 215 Cal. 226 [9 P.2d 302].)

Neither side to this appeal contends that the agreement of March 8, 1948, was invalid and we proceed upon the assumption that there was no infirmity in it.

Without any explanation in the evidence it appears that the same parties made another agreement, the one in suit, on April 30, 1948. The main paragraph reads as follows: "In consideration of the payment of the sum of Twenty-six Thousand Two Hundred Fifty Dollars ($26,250.00) to the undersigned, BEN MINDENBERG, or order, payable in instalments as hereinafter set forth, I hereby assign, transfer, set over, deliver, acquit and release to CARMEL FILM PRODUCTIONS, INC., all of my right, title and interest therein, whether represented by stock or arising out of that certain "Memorandum of Agreement" between the parties hereto dated March 8, 1948." The price was payable in installments, of which $6,500, and no more, was paid. The contract further says: "As security for the payment of the aforesaid obligation, the said corporation represents that it has instructed its attorney, EZRA E. STERN, who the said corporation further represents is now holding ten (10) shares of the capital stock of the undersigned in said corporation, for the undersigned, to retain said stock certificate on behalf of the undersigned, and the undersigned hereby instructs the said EZRA E. STERN to deliver said certificate, duly endorsed, to the corporation only upon payment by said corporation of the considerations for this Agreement, and upon notice of such payment in writing by the undersigned." The corporation thus recognized plaintiff's ownership of the 10 shares standing in Stern's name and plaintiff contracted on that basis. The contract can mean nothing other than a sale of the 10 shares of issued stock and the right to issuance of certificate for 18¾ per cent of the entire stock, be they cumulative or alternative rights resting in plaintiff.

The second count alleges that defendant at all times ". . . had a sufficient earned surplus out of which to pay the monies required to be paid to plaintiff on account of said contract. . . ." Also that there has been at no time ". . . any reasonable ground for believing that defendant CARMEL FILM PRODUCTIONS, INC. was or is unable, or by reason of paying the balance due upon said contract Exhibit "B" would be rendered unable, to satisfy its debts and liabilities when they fell due." These allegations are directed toward compliance with the Corporations Code. Section 824 provides: "Except as provided in this division, the directors of a corporation shall

not authorize or ratify the purchase by it of its shares, or declare or pay dividends, or authorize or ratify the withdrawal or distribution of any part of its assets among its shareholders.'' Sections 825-828 and 1715 prescribe penalties and other remedies incident to a violation. Section 1706 specifies situations in which the corporation may purchase its shares out of stated capital or surplus, none of which is pertinent here. And section 1707: ''A corporation may also purchase shares issued by it, or by a corporation of which it is subsidiary, in any of the following cases: . . . (c) Subject to any limitations contained in its articles, out of earned surplus. Purchases under this subdivision are not limited to cases authorized under other subdivisions of this section or of Section 1706.'' Section 1708: ''A corporation shall not purchase or redeem shares issued by it, or by any corporation of which it is subsidiary, in any case when there is reasonable ground for believing that the corporation is unable, or, by such purchase or redemption, will be rendered unable, to satisfy its debts and liabilities when they fall due, except such debts and liabilities as have been otherwise adequately provided for.'' Notwithstanding compliance with these statutes in his pleading, plaintiff sought declaratory relief to the effect that neither contract was an agreement by a corporation to purchase its own shares. The court so ruled and, denying declaratory relief, rendered judgment for plaintiff for $19,750 plus interest and costs.

Having held that the contract was not within the statute the court made no finding as to the existence of an earned surplus. Defendant, as appellant, asserts this to be error because the contract was plainly within the purview of section 1707 and its limitation to the use of earned surplus for such repurchases. And defendant is correct in this. The 10 shares of stock issued to Stern and held in trust for plaintiff were still outstanding and were specifically made a part of the subject matter of the sale.

Plaintiff, though he alleged there was an earned surplus, failed to prove it. Defendant Belinkoff, a certified public accountant who kept the corporate books, testified there was none on July 31, 1948 (two months after the contract date); that the corporate income tax return showed a surplus deficit of $2,933.65 as of July 31, 1948; that there was an actual surplus of $7,161.42 in July 31, *1949*; but that the books, (and hence these figures) were upon an accrual basis. Defendant Kaplan, who was vice president at the time of the agreement, stated that there was no earned surplus on that date, that he

consulted an attorney in October 1948 and thereupon the company ceased to make payments on the contract.

In an effort to prove an earned surplus plaintiff presented as a witness Robert B. Roskowick, a certified public accountant, who examined the Carmel books in 1951. He attempted to show that there probably was an earned surplus by building up a synthetic or computed inventory, one which did not appear on the books. He started with an inventory of $85,101.47 on July 31, 1948, which appeared in the income tax return; then he computed the relationship between sales and costs, assuming it to be constant, and concluded there should have been an inventory of $53,426.42 in January 1949. But the uncontradicted evidence of defendant Belinkoff was that the company never carried any inventory in fact because it would buy film as needed and turn it over to Hollywood and charge Hollywood for it; that the inventory appearing in the income tax return was not an actual one but was used because of the exigencies of its loan arrangement with Bank of America. And Mr. Roskowick did not carry through to a computed surplus by deducing expenses or obligations. He said the books showed an earned surplus on July 31, *1949,* of $7,161.42, but a deficit in surplus on July 31, 1948, of $2,933.65. Also that the books were kept on an accrual basis, and the above figures were a result of that method. The witness further said he did not know whether there was an actual earned surplus or not, just what the books showed. Also that the $7,100 surplus was made up of three items, an account receivable of some $8,500 and two accounts payable totaling $1,200 to $1,500; that no other assets or liabilities were taken into account as they had been written off the books. This was in July 1949, after the company had quit business. This surplus item did not take into account any moneys owing to plaintiff; indeed, there was no such item on the books. Nor did it take cognizance of an obligation to De Luxe Film Laboratories of uncertain amount. This proof would not have supported an affirmative finding of the existence of the necessary earned surplus.

Ballantine and Sterling on California Corporation Laws (1949 ed.) section 152, page 211: "It is the theory of these sections that as a general rule the purchase by a corporation of its own shares should not be allowed except out of earned surplus which would be available for distribution as cash dividends. The withdrawal of assets by a shareholder upon a sale or surrender of his shares has the same effect upon creditors as the payment of a dividend." It appears that sections

1501 and 1502, Corporations Code, concerning declaration of dividends, closely parallel sections 1707 and 1708 (above quoted) relating to purchase of stock. Ballantine and Sterling further say, in section 132, at page 177: "Section 1500, subd. (a), authorizes dividends to be declared in cash or in property only out of 'earned surplus,' and Subd. (b) gives an alternative that dividends may be declared 'out of net profits earned during the preceding accounting period,' despite the fact that the net assets amount to less than the stated capital. The code makes no attempt to define what is meant by 'earned surplus' or by 'net profits.' . . . The *earned surplus rule* limits the authority to declare dividends according to the existence of a balance or excess of assets over liabilities including stated capital, such excess being derived from profits or earnings. Earned surplus then represents the accumulated net earnings or balance of profits since incorporation or time of recapitalization, after deductions for amount of dividends paid therefrom, losses and other charges. This is usually ascertained from the balance sheet."

The law is settled to the effect that paper profits, or anticipated earnings, or accrued items of debit or credit are not to be taken into consideration in computing earned surplus, either for purpose of dividends or as basis for corporate purchase of its own shares of stock. (See 6A Cal.Jur. § 443, p. 787; 13 Cal.Jur.2d § 254, p. 31; *Southern Calif. Home Builders* v. *Young,* 45 Cal.App. 679, 693 [188 P. 586].) The evidence in this case does not establish the existence of an earned surplus at any time. The burden so to do rested on plaintiff. (*Goodman* v. *Global Industries,* 80 Cal.App.2d 583 [182 P.2d 300]; *Flynn* v. *California Casket Co.,* 105 Cal.App.2d 196 [233 P.2d 131]; *Schreiber* v. *San Joaquin Exploration Co.,* 125 Cal.App.2d 171 [270 P.2d 19].)

In the absence of an earned surplus such an agreement is void. It falls within the doctrine of *Smith* v. *Bach,* 183 Cal. 259, 262 [191 P. 14] "that where a statute prohibits or attaches a penalty to the doing of an act, the act is void, and this, notwithstanding that the statute does not expressly pronounce it so, and it is immaterial whether the thing forbidden is *malum in se* or merely *malum prohibitum.*" *Stevens* v. *Boyes Hot Springs Co.,* 113 Cal.App. 479 [298 P. 508], applies this principle to contracts such as the one under discussion here. In that case an installment note was given as consideration for the purchase of the corporation's own shares. One of the payments was made, then the corporate successor

of the maker refused to pay any more, alleging illegality, and it also sought recovery of the sum previously paid on the purchase price. It prevailed in both respects. The case arose in 1922 under sections 309 and 359, Civil Code; the court held that the transaction was not within any of the exceptions to the prohibition upon dividing, withdrawing or paying to stockholders any part of the capital stock; that the transaction was void and the note unenforceable. "Upon this subject we conclude that the defense relied on by defendants, namely, that the contract was void as being prohibited by statute, is sound, and the conclusion of the trial court upon this subject is correct. Contracts of this character being unlawful and against the express law and public policy, cannot be enforced and they are void *ab initio*. (§ 1667, Civ. Code.)" (*Stevens* v. *Boyes Hot Springs Co., supra,* 113 Cal.App. 479, 483.) At bar, as in Stevens, we have a present sale with an *immediate* payment of $5,000 and no earned surplus at any time. We think this case is governed by the Stevens case and that plaintiff, upon the showing made at the trial, was not entitled to recover.

In the main, the foregoing discussion as to the existence of an earned surplus applies to plaintiff's allegation "That there is not now, nor at any time since the execution of the said contract Exhibit "B" has there been, any reasonable ground for believing that the defendant CARMEL FILM PRODUCTIONS, INC. was or is unable, or by reason of paying the balance due upon said contract Exhibit "B" would be rendered unable, to satisfy its debts and liabilities when they fell due." It was incumbent upon him to prove this averment as well as that of an existing earned surplus. (*Goodman* v. *Global Industries,* 80 Cal.App.2d at page 589.) Plaintiff dismally failed in his attempted proof of this allegation. His complaint, filed on March 30, 1953, alleged in counts one and three that the corporation was then insolvent and the evidence was that the only known asset at the time of trial was $8,585 due from Hollywood Film Enterprises and and some valueless films.

The trial judge, losing sight of the 10 shares owned by plaintiff, held there was no sale or purchase of "stock of defendant corporation" because plaintiff's interest so sold was merely an undivided interest in the corporate assets. This ignores the legal effect of the agreement for "a present 18-¾% interest in and to all of the assets of said corporation. . . ."

The issuance of the certificate was not essential to

plaintiff becoming a stockholder. (*Kauffman* v. *Meyberg*, 59 Cal.App.2d 730, 739 [140 P.2d 210]; *Reeder* v. *Finderup*, 78 Cal.App. 305, 308 [248 P. 525]; *Majors* v. *Girdner*, 31 Cal. App. 47, 51 [159 P. 826]; *Mitchell* v. *Beckman*, 64 Cal. 117, 121 [28 P. 110].) ▮ "Capital stock" means, " '. . . not the shares of which the nominal capital is composed, but the actual capital, i.e., assets, with which the corporation carries on its corporate business.' " (*Hansen* v. *California Bank*, 17 Cal.App.2d 80, 94 [61 P.2d 794].) (See also *Kohl* v. *Lilienthal*, 81 Cal. 378, 385 [20 P. 401, 22 P. 689, 6 L.R.A. 520]; *Tapscott* v. *Mexican Colorado etc. Co.*, 153 Cal. 664, 667-668 [96 P. 271].) ▮ The sale of plaintiff's 18¾ per cent interest was a sale of stock.

Moreover, the same section (824) which forbids purchase of shares (except as provided by statute) also prohibits "the withdrawal or distribution of any part of its assets among its shareholders." The net result of the transaction, if consummated, would be distribution to plaintiff of assets in excess of $26,000 and resumption by the corporation of his 18-¾ per cent interest in its assets and profits. The initial invalidity of purchase of its own stock by a corporation grew out of the fact that ". . . the result constitutes an illegal withdrawal and payment to stockholders of a part of the capital stock, contrary to the statutory provisions of law. . . ." (*Hansen* v. *California Bank*, *supra*, 17 Cal.App.2d 80, 93.)

*Robinson* v. *Wangemann*, (10 Cir.) 75 F.2d 756, 757: "A transaction by which a corporation acquires its own stock from a stockholder for a sum of money is not really a sale. The corporation does not acquire anything of value equivalent to the depletion of its assets, if the stock is held in the treasury, as in this case. It is simply a method of distributing a proportion of the assets to the stockholder." The only permissive withdrawal or distribution of assets is "as provided in this division" (§ 824); and that division comprises sections 100-6804; included within it are sections 5000-5012 which cover the matter of distributions and limit same to the process of winding up.

It is apparent that the contract in suit was void whether treated as a sale of the 10 shares of stock held in trust for plaintiff by Stern or as a withdrawal of moneys in lieu of his 18¾ per cent of the corporate assets.

It is also evident that plaintiff is precluded from recovery by his failure to prove that there was no violation of section 1708, Corporations Code.

The judgment of nonsuit is affirmed; the judgment for plaintiff and against defendant Carmel Film Productions, Inc. is reversed.

Shinn, P. J., and Vallée, J., concurred.